IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Mohammed Ahmed Ali Al-Asadi, *et al.* ) | |
| ) | 1:05-CV-02197 (HHK) |
| *Petitioners*, ) | |
| ) | MOTION |
| v. ) | FOR ORDER REQUIRING |
| ) | ADVANCE NOTICE OF ANY |
| George W. Bush, *et al.*, ) | INTENDED TRANSFER OR |
| ) | REMOVAL OF PETITIONER |
| *Respondents*. ) | FROM GUANTÁNAMO |
| ) | |

**MOTION FOR AN ORDER REQUIRING 30-DAYS
ADVANCE NOTICE TO THIS COURT AND COUNSEL FOR PETITIONER
OF ANY INTENDED REMOVAL OF PETITIONER FROM GUANTÁNAMO**

Pursuant to Rule 65 of the Federal Rules of Civil Procedure and the All Writs Act, 28 U.S.C. § 1651, Petitioner Al-Asadi, through his Next-Friend and by undersigned counsel, respectfully moves for an order requiring Respondents to provide this Court and counsel for Petitioners advance notice of any intended removal of Petitioner from Guantánamo Bay Naval Base in Cuba. On information and belief, Respondents have contemplated or are contemplating removal of Petitioner from Guantánamo to foreign territories for torture or indefinite imprisonment without due process of law. Petitioner Al-Asadi requests the advance notice to enable undersigned counsel to contest any such removal from Guantánamo and preserve the jurisdiction of the Court in this matter.

**Factual Background**

Petitioner Mohammed Ahmed Ali Al-Asadi is a citizen of Yemen who is being detained as an "enemy combatant" at the Guantánamo Bay Naval Base in Cuba. As detailed in his habeas petition filed on November 9, 2005, Petitioner Al-Asadi denies being an "enemy combatant" and

contends he is being detained in violation of the Constitution, treaties and laws of the United States.

Petitioner Al-Asadi has reason to fear that he will be transferred to a country where he will be tortured and/or detained indefinitely without due process of law. Upon information and belief, the United States has secretly removed detainees and others suspected of terrorist crimes to other countries for interrogation or detention without complying with extradition or other legal process. This practice, known as "rendition," "irregular rendition," or "extraordinary rendition," is understood to be used to facilitate interrogation by subjecting detainees to torture.

The "rendition" process was originally "a program aimed at a small, discrete set of suspects – people against whom there were outstanding foreign arrest warrants," but after September 11 came to include a "wide and ill-defined population that the Administration terms 'illegal enemy combatants.'" Jane Mayer, *Outsourcing Torture*, New Yorker, Feb. 14, 2005, at http://www.newyorker.com/fact/content/?050214fa_fact6, ¶ 7. In fact, the *Washington Post* has reported that "[s]ince Sept. 11, the U.S. government has secretly transported dozens of people suspected of links to terrorists to countries other than the United States, bypassing extradition procedures and legal formalities, according to Western diplomats and intelligence sources." Rajiv Chanrasekaran & Peter Finn, *U.S. Behind Secret Transfer of Terror Suspects*, Wash. Post, Mar. 11, [2002], at A1. The *Washington Post* continues, "suspects have been taken to countries . . . whose intelligence services have close ties to the CIA and where they can be subjected to interrogation tactics – including torture and threats to families – that are illegal in the United States, the sources said. In some cases, U.S. intelligence agents remain closely involved in the interrogation, the sources said." *Id.*; *see also* Dana Priest & Barton Gellman, *U.S. Decries Abuse But Defends Interrogations,* Wash. Post, Dec. 26, 2002, at A1.

Many of the countries to which "released" detainees have been sent practice torture. *See, e.g.*, Megan K. Stack & Bob Drogin, *Detainee Says U.S. Handed Him Over For Torture*, L.A. Times, Jan. 13, [2005], at A1 ("News accounts, congressional testimony and independent investigations suggests that [the CIA] has covertly delivered at least 18 terrorism suspects since 1998 to Egypt, Syria, Jordan and other Middle Eastern nations where, according to State Department reports, torture has been widely used on prisoners.").

In fact, one Guantánamo detainee, Mamdouh Habib, was rendered to Egypt by the United States *before* being moved to Cuba. During his six months in Egyptian custody, Mr. Habib was allegedly tortured without mercy. Mr. Habib reported that

> he was beaten frequently with blunt instruments, including an object that he likened to an electric 'cattle prod.' And he was told that if he didn't confess to belonging to Al Qaeda he would be anally raped by specially trained dogs. . . . Habib said that he was shackled and forced to stand in three torture chambers: one room was filled with water up to his chin, requiring him to stand on tiptoe for hours; another chamber, filled with water up to his knees, had a ceiling so low that he was forced into a prolonged, painful stoop; in the third, he stood in water up to his ankles, and within sight of an electric switch and a generator, which his jailers said would be used to electrocute him if he didn't confess.

Mayer, *Outsourcing Torture* at ¶ 54.

The Mr. Habib's account is corroborated State Department reports, which consistently identify the Egyptian government as a practitioner of torture. In a report released on February 28, 2005, for example, the State Department found that "there were numerous, credible reports that security forces tortured and mistreated detainees" and that "torture and abuse of detainees by police, security personnel, and prison guards remained common and persistent." Dep't of State, *Country Reports On Human Rights Practices, Egypt 2004*, at http://www.state.gov/g/drl/rls/hrrpt/2004/41720.htm, § 1(c). As such, Petitioner Al-Asadi is rightfully worried about the possibility of being tortured and/or treated to cruel inhumane conduct as a result of being transferred, removed or rendered from Guantánamo. To oppose such a

possibility, undersigned counsel move for a order requiring the Government to provide advance notice to this Court and undersigned counsel of any intended transfer, removal, release or rendition of Petitioner Al-Asadi.

### An Order Requiring Advance Notice of Any Intended Transfer or Removal is an Appropriate Exercise of this Court's Power.

Under the All Writs Act, 28 U.S.C. § 1651(a), this Court has the inherent power "to issue injunctions to protect its jurisdiction." *SEC v. Vision Communications, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996); *Envtl. Def. Fund v. EPA*, 485 F.2d 780, 784 n.2 (D.C. Cir. 1973). As well, Petitioner Al-Asadi's motion meets the most fundamental purpose of preliminary injunctive relief; "to preserve the status quo between the parties pending a final determination of the merits of the action." 13 Moore's Federal Practice 3d, § 65.20 (2004).

In fact, each of the four factors to be weighed in awarding preliminary injunctive relief favors the requested injunction here: (1) Petitioner will suffer irreparable harm if the injunction is denied; (2) no harm will be suffered by Respondents if the injunction is granted; (3) Petitioner are likely to succeed on the merits of their claims; and (4) there is a clear public interest in preventing the United States Government from rendering individuals to foreign countries for detention and torture. *See Al-Fayed v. CIA*, 254 F.3d 300, 303 & n.2 (D.C. Cir. 2001); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998).

First, Petitioner Al-Asadi stands to suffer immeasurable and irreparable harm—from torture to possible death—at the hands of a foreign government. As a Yemeni citizen, Petitioner Al-Asadi is at risk of being transferred or rendered to Yemen for interrogation and torture. News reports indicate that the United States government has contemplated transferring "large numbers of […] Yemeni detainees from the military's Guantánamo Bay, Cuba, detention center into new

U.S.-built prisons in their home countries." Dana Priest, *Long-Term Plan Sought For Terror Suspects*, Wash. Post, Jan. 2, 2005, at A1; *see also* BBC Worldwide Monitoring, "USA to release 107 Yemenis from Guantánamo Bay," August 10, 2005. As such, transfer to Yemen is a real possibility.

Unfortunately, transfer or release to Yemen raises particularly strong concerns. "The [Yemeni] Government acknowledged publicly that torture occur[s]." Dept. of State, *Country Reports On Human Rights Practices, Yemen 2004*, available at http://www.state.gov/g/drl/rls/hrrpt/2004/41736.htm, § 1(c) (Noting reports of government security forces using torture on detainees). And in addition to torture, conditions in Yemeni jails are widely reported to be egregious. "Prison conditions [in Yemen] were poor and did not meet internationally recognized standards, and the Government permitted limited visits by independent human rights observers. The Government allowed limited access to detention facilities by parliamentarians and some nongovernmental organizations (NGOs)." *Id.* at § 1(c). The State Department report continues, "[p]risons were extremely overcrowded, sanitary conditions were poor, and food and health care were inadequate to nonexistent. Prison authorities often exacted bribes from prisoners to obtain privileges, or refused to release prisoners who completed their sentences until family members paid a bribe. In some cases, authorities arrested without charge and held refugees, persons with mental disabilities, and illegal immigrants in prisons with common criminals." *Id.*

In fact, undersigned counsel recently traveled to Yemen and spoke with a former Guantánamo detainee whom had been "released" to Yemen, where he was placed in continued detention and interrogated via torture. *See* Foster Declaration Ex. A. That detainee was transferred with no advance notice, continually tortured for interrogation purposes and has been held

in egregious conditions of confinement. *Id.* at ¶¶ 20-24. Thus, the potential harm to Petitioner Al-Asadi weighs heavily in favor of granting this motion.[1]

Secondly, by contrast, Respondent's will not suffer any harm from granting this motion. Respondents are asked only to provide counsel and the Court with adequate notice of any intended removal of Petitioner from Guantánamo. Respondents can suffer no conceivable harm from complying with such a request. Thus, this factor supports, or at least does not obstruct, the granting of this motion.

Third, Petitioner Al-Asadi is likely to succeed on the merits of his claims. Petitioner has properly invoked the jurisdiction of this Court. *See Rasul v. Bush*, 542 U.S. 466, 483; 124 S. Ct. 2686, 2698 (2004). Judge Green has already ruled that detainees in similar circumstances to Petitioner Al-Asadi have stated actionable claims under the Due Process Clause and the Geneva Conventions. For the United States Government to remove Petitioners to countries that would afford no such protections would be to flout Judge Green's ruling and defeat the Court's jurisdiction. Such a transfer would also violate basic international legal norms embodied not only in the Geneva Conventions but also in the International Covenant on Civil and Political Rights and the Convention Against Torture and Other Cruel and Degrading Treatment and Punishment. Thus, this factor supports the granting of this motion.

Lastly, public policy favors requiring Respondents to provide advance notice to counsel and the Court of any intended removal of Petitioner from the Court's jurisdiction. No matter how satisfied the Executive Branch may be that its actions are lawful, the public good requires that a federal litigant—properly before the Court and represented by counsel—be provided with a

---

[1] In addition, transfer or rendition to another country, even if "only" for continued imprisonment, also circumvents Petitioner's right to adjudicate the legality of his detention in this Court.

meaningful opportunity to contest his transfer into the hands of those who might torture him or detain him indefinitely. Because of the great prospective harm following transfer or removal without notice, and the lack of any foreseeable harm to the Government, public policy favoring judicial review should be given effect. As such, this factor weighs heavily in favor of granting this motion.

In fact, virtually every judge in this district who has considered this issue has entered similar preliminary injunctions and/or temporary restraining orders in favor of the habeas petitioners. *See, e.g., Abdah v. Bush,* No. 04-cv-1254 (D.D.C Mar. 12, 2005) (Collyer, J.) (Granting Petitioners' motion for a temporary restraining order); *Abdah v. Bush,* No. 04-cv-1254 (D.D.C. Mar 29, 2005) (Kennedy, J.) (Granting motion for a preliminary injunction and order Respondents not to remove Petitioners without a 30-day notice); *Al-Mohammed v. Bush,* No. 05-cv-247 (D.D.C. Mar. 30, 2005) (Kennedy, J.) (same); *Al-Oshan v. Bush,* No. 05-cv-520 (Mar. 31, 2005) (Urbina, J.) (Ordering Respondents to provide 30-day advance notice before removing Petitioners and denying Petitioners' motion for preliminary injunction as moot); *Al-Shihry v. Bush,* No. 05-cv-490 (D.D.C. Apr.1, 2005) (Friedman, J.) (same); *Al-Wazan v. Bush,* No. 05-cv-329 (D.D.C. Apr. 1, 2005) (Friedman, J.) (same); *Al-Marri v. Bush,* No. 04-cv-2035 (D.D.C. Apr. 4, 2005) (Kessler, J.) (Granting motion for preliminary injunction requiring 30-days notice and denying Petitioners TRO as moot); *Al-Joudi v. Bush,* No 05-cv-301 (D.D.C. Apr. 4, 2005) (Kessler, J.) (same).

## Conclusion

For the reasons discussed above, the motion should be granted.

Dated: November 17, 2005.

Respectfully submitted,

Counsel for Petitioners:

_____
Barbara J. Olshansky (NY0057)
Director Counsel
Tina M. Foster (TF5556)
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6439
Fax: (212) 614-6414